UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

GEORGE PAPADOPOULOS,

Defendant.

Case No: 1 17-mj-539
Assigned To: Chief Judge Beryl A Howell
Date Assigned: 7/28/2017
Description: Complaint

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Robert M. Gibbs, being first duly sworn, hereby depose and state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have served in this capacity since 2003. I have conducted numerous investigations into complex domestic and extraterritorial crimes, including crimes related to espionage and foreign influence.

2.     I am familiar with the facts and circumstances set forth below from my examination of various reports and records, my review of publicly available information, and my conversations with law enforcement officers and others. Because this affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, it does not set forth every fact learned in the course of this investigation.

### The Defendant

3.     Based on the investigation to date, I know that GEORGE PAPADOPOULOS, the defendant, served as a foreign policy advisor for the presidential campaign of Donald J. Trump (the "Campaign") starting no later than on or about March 16, 2016 and continuing through most of the Campaign. PAPADOPOULOS had previously been a foreign policy advisor for a different presidential candidate.

4.     On or about March 21, 2016, then-presidential candidate Donald J. Trump met with *The Washington Post* and provided the names of five individuals identified as members of the Campaign's foreign policy team, including GEORGE PAPADOPOULOS, the defendant.

### The Investigation

5.     At all times relevant to the offenses described herein, the FBI, as part of its counterintelligence mission, had an open investigation into the Russian government's efforts to interfere in the 2016 presidential election, including the nature of any links between individuals associated with the Campaign and the Russian government, and into whether there was any coordination between the Campaign and the Russian government. The investigation included assessing whether any crimes were committed. The investigation was opened and coordinated in Washington, D.C. and had commenced in 2016. The investigation was ongoing in January 2017 when two FBI special agents (the "Agents") interviewed GEORGE PAPADOPOULOS, the defendant.

6.     Based on my training and experience, I am aware that the Russian government and its intelligence and security services frequently make use of non-governmental intermediaries to achieve their foreign intelligence objectives. This structure serves in part to hide the overt involvement of the Russian government and provides deniability about the involvement of the government and its intelligence and security services. I am aware that the Russian government has used individuals associated with academia and think tanks in such a capacity. As a result, the investigation has included the extent to which such intermediaries had contact with individuals associated with the Campaign, including GEORGE PAPADOPOULOS, the defendant.

### Overview of the Offenses

2

7.     Based on the information provided herein, there is probable cause to believe that on or about January 27, 2017, GEORGE PAPADOPOULOS, the defendant, made material false statements and omitted material facts to the FBI regarding his interactions during the Campaign with foreign contacts, including Russian nationals. On that date, PAPADOPOULOS met with the Agents, and after being advised that the failure to be truthful could lead to criminal penalties, PAPADOPOULOS made material false statements and omitted material facts. For example, PAPADOPOULOS falsely described his interactions with a certain foreign contact who discussed "dirt" related to emails concerning then-presidential candidate Hillary Clinton, when, in truth and in fact, PAPADOPOULOS had repeated communications with that foreign contact while PAPADOPOULOS was serving as a foreign policy advisor to the Campaign.

8.     There is also probable cause to believe that on or about February 17, 2017, GEORGE PAPADOPOULOS, the defendant, obstructed the FBI's investigation that was being coordinated in the District of Columbia. After speaking again to the FBI on or about February 16, 2017, and reiterating his purported willingness to cooperate with the FBI's investigation, PAPADOPOULOS the next day shut down his existing Facebook account, which he had maintained since approximately August 2005. That account contained communications he had with Russian nationals and other foreign contacts during the Campaign that contradicted statements he had made to the FBI. Shortly after he shut down his account, PAPADOPOULOS created a new Facebook account that contained no communications he had during the Campaign with foreign contacts.

9.     I submit that the conduct of GEORGE PAPADOPOULOS, the defendant, as described herein, had a negative impact on the FBI's ongoing investigation into the existence

of any links or coordination between individuals associated with the Campaign and the Russian

government in connection with Russia's efforts to interfere with the 2016 presidential election

by, among other things, concealing links to individuals and intermediaries associated with the

Russian government.

### Defendant's False Statements to the FBI

10.     On or about January 27, 2017, the Agents met with GEORGE

PAPADOPOULOS, the defendant, in Chicago, Illinois.  PAPADOPOULOS agreed to a

voluntary interview.

11.     The Agents informed PAPADOPOULOS that the FBI was investigating

interference by the Russian government in the 2016 presidential election and whether any

individuals related to the Campaign were involved.  The Agents, using an FBI recording device,

taped the interview.

12.     The Agents informed PAPADOPOULOS that he needed to be truthful and

warned that he could get "in trouble" if he lied.  The Agents also advised him that lying to them

"is a federal offense."  They confirmed that the interview was "completely voluntary."

### *False Statements by PAPADOPOULOS Regarding Foreign Contact 1*

13.     During the course of his January 27, 2017 interview with the FBI,

GEORGE PAPADOPOULOS, the defendant, acknowledged that he knew a particular professor

of diplomacy based in London ("Foreign Contact 1").  Foreign Contact 1 is a citizen of a country

in the Mediterranean and an associate of several Russian nationals, as described further below.

PAPADOPOULOS stated that Foreign Contact 1 told him that the Russians had "dirt" on

Clinton.

4

a.      PAPADOPOULOS told the Agents that, in the early part of 2016,

Foreign Contact 1 "actually told me that the Russians had emails of Clinton. That guy told me."

PAPADOPOULOS further stated that Foreign Contact 1 told him that the Russians "have dirt on

her," meaning Clinton, and that "they have thousands of emails."

b.      PAPADOPOULOS, however, claimed to have received this

information prior to joining the Campaign. He told the Agents: "This isn't like [Foreign Contact

1 was] messaging me while I'm in April with Trump."

c.      PAPADOPOULOS stated that he did not tell anyone on the

Campaign about the "dirt" on Clinton because he "didn't even know [if] that was real or fake or

he was just guessing because I don't know, because the guy [Foreign Contact 1] seems like

he's . . . he's a nothing."

14.      However, upon review of documents and other information obtained in the

course of this investigation, including emails obtained through a judicially authorized search

warrant, I believe that the statements made by GEORGE PAPADOPOULOS, the defendant,

falsely characterized his interactions with Foreign Contact 1, including his representation that

Foreign Contact 1 seemed like "a nothing." For example:

a.      On or about March 24, 2016, which was three days after the

Campaign's announcement of its foreign policy advisors, including PAPADOPOULOS,

PAPADOPOULOS emailed Campaign officials that he had "just finished a very productive

lunch with a good friend of mine, [Foreign Contact 1] . . . – who introduced me to both Putin's

niece and the Russian Ambassador in London – who also acts as the Deputy Foreign Minister."

PAPADOPOULOS further wrote: "The topic of the lunch was to arrange a meeting between us

and the Russian leadership to discuss U.S.-Russia ties under President Trump. They are keen to

host us in a 'neutral' city, or directly in Moscow. They said the leadership, including Putin, is ready to meet with us and Mr. Trump should there be interest. Waiting for everyone's thoughts on moving forward with this very important issue." PAPADOPOULOS acknowledged to the FBI that the individual he referred to as "Putin's niece" was a Russian national ("Foreign Contact 3," further described below).

b. On or about April 18, 2016, Foreign Contact 1 emailed PAPADOPOULOS, stating that he had a "long conversation in Moscow with my dear friend ["Foreign Contact 2"] . . . about a possible meeting between the two of you. [Foreign Contact 2] is ready to meet with you in London (or USA or Moscow). I am putting the two of you in touch to discuss when and where this potential meeting can actually take place." Foreign Contact 1 copied Foreign Contact 2 on the email to PAPADOPOULOS, who responded by offering to "try and come to Moscow" and setting up a Skype call with Foreign Contact 2 for 3:00 p.m. "Moscow time." In subsequent emails between PAPADOPOULOS and Foreign Contact 2, Foreign Contact 2 represented himself as a Russian national with access to Russian government officials.

c. On or about April 22, 2016, Foreign Contact 2 sent PAPADOPOULOS an email thanking him "for an extensive talk!" and proposing "to meet in London or in Moscow." PAPADOPOULOS replied by suggesting that "we set one up here in London with the Ambassador as well to discuss a process moving forward."

d. After additional email communications between PAPADOPOULOS and Foreign Contact 2, including setting up conversations over Skype, on or about May 4, 2016, Foreign Contact 2 informed PAPADOPOULOS by email that Foreign Contact 2 had "just talked to my colleagues from the MFA. [They are] open for cooperation.

6

One of the options is to make a meeting for you at the North America Desk, if you are in Moscow." I know based on public sources and my own training and experience that the MFA is the Russian Ministry of Foreign Affairs, which is the governmental body responsible for Russian foreign relations. PAPADOPOULOS responded to the May 4 email from Foreign Contact 2 that he was "[g]lad the MFA is interested."

    e.  Between on or about May 4, 2016 and on or about May 21, 2016, PAPADOPOULOS forwarded the May 4, 2016 email from Foreign Contact 2 described above to three separate individuals who at the time were senior officials with the Campaign. In one of the forwarding emails to one Campaign official, PAPADOPOULOS wrote "Russia updates." In another forwarding email to another Campaign official, PAPADOPOULOS wrote: "Regarding the forwarded message, Russia has been eager to meet Mr. Trump for quite sometime and have been reaching out to me to discuss."

    f.  On or about May 8, 2016, Foreign Contact 2 emailed PAPADOPOULOS and Foreign Contact 1 about putting PAPADOPOULOS in touch with the "MFA head of the US desk." Further emails show that over the course of the subsequent weeks, Foreign Contact 2 set up Skype calls with PAPADOPOULOS and discussed, among other things, the fact that Foreign Contact 2 reported a "good reaction from the US desk at the MFA."

    g.  On or about July 14, 2016, PAPADOPOULOS emailed Foreign Contact 2 and proposed a "meeting for August or September in the UK (London) with me and my national chairman, and maybe one other foreign policy advisor and you, members of president putin's office and the mfa to hold a day of consultations and to meet one another. It has been approved from our side."

### *False Statements by PAPADOPOULOS Regarding Foreign Contact 3*

15.     During the course of his January 27, 2017 interview with the FBI,

GEORGE PAPADOPOULOS, the defendant, acknowledged meeting Foreign Contact 3.

Foreign Contact 3 represented that she had access and ties to the Russian government.

PAPADOPOULOS characterized the extent, timing, and nature of his interactions with Foreign

Contact 3 as follows:

a.      In response to questioning by the Agents about Russian contacts,

PAPADOPOULOS acknowledged that Foreign Contact 1 had introduced him to Foreign Contact

3.  PAPADOPOULOS stated that the introduction took place "a year ago, this was before I even

got with-with Trump."

b.      When asked by the Agents to what extent PAPADOPOULOS and

Foreign Contact 3 communicated, PAPADOPOULOS responded, "She sent emails" to the effect

of "Just, 'Hi, how are you?' That's it."

16.     However, upon review of documents and other information obtained in the

course of this investigation, including emails obtained through a judicially authorized search

warrant, I believe that the statements made by GEORGE PAPADOPOULOS, the defendant,

characterizing the extent of his interactions with Foreign Contact 3 as just email pleasantries and

his representation that he met Foreign Contact 3 "a year ago," "before I even got with Trump,"

were false and misleading.  For example:

a.      As set forth above, on or about March 24, 2016, which was three

days after PAPADOPOULOS was publicly named as a foreign policy advisor to the Campaign,

PAPADOPOULOS emailed Campaign officials that he had "just finished a very productive

lunch with a good friend of mine, [Foreign Contact 1] – who introduced me to . . . Putin's niece

[Foreign Contact 3]."

8

          b.      On or about April 10, 2016, PAPADOPOULOS emailed Foreign Contact 3, re-introducing himself and noting that he was "Donald Trump's advisor." PAPADOPOULOS reminded Foreign Contact 3 that "[w]e met with [Foreign Contact 1] in London. The reason for my message is because [Foreign Contact 1] sent an email that you tried contacting me." PAPADOPOULOS wrote that "it would be a pleasure to meet again. If not, we should have a call and discuss some things." PAPADOPOULOS ended the email with his mobile number and a request for Foreign Contact 3's mobile number.

          c.      Foreign Contact 3 replied to PAPADOPOULOS on or about April 11, 2016, and stated that she was "now back in St. Petersburg" but would be "very pleased to support your initiatives between our two countries and of course I would be very pleased to meet you again." PAPADOPOULOS responded, copying Foreign Contact 1, that "I think a good step would be for me to meet with the Russian Ambassador in London sometime this month" and that PAPADOPOULOS would "like to discuss with him, or anyone else you recommend, about a potential foreign policy trip to Russia." Foreign Contact 1 responded: "This is already been agreed. I am flying to Moscow on the 18th for . . . meetings at the Duma." I know based on public sources that the Duma is a Russian government legislative assembly.

          d.      On or about the following day, April 12, 2016, Foreign Contact 3 emailed PAPADOPOULOS and stated that "I have already alerted my personal links to our conversation and your request. The Embassy in London is very much aware of this. As mentioned we are all very excited by the possibility of a good relationship with Mr. Trump. The Russian Federation would love to welcome him once his candidature would be officially announced."

e.      PAPADOPOULOS and Foreign Contact 3 continued to exchange emails about the Campaign and exchanged Skype contact information to communicate by Skype. For example, on or about April 29, 2016, PAPADOPOULOS wrote: "I am now in the process of seeing if we will come to Russia.  Do you recommend I get in touch with a minister or embassy person in Washington or London to begin organizing the trip?"  Foreign Contact 3 replied, "I think it would be better to discuss this question with [Foreign Contact 1]."  PAPADOPOULOS responded, "Ok. I called him."

### Defendant's Obstruction

17.      GEORGE PAPADOPOULOS, the defendant, was interviewed again by the FBI on or about February 16, 2017.  At that interview, in which his counsel was present, PAPADOPOULOS reiterated his purported willingness to cooperate with the FBI's investigation.

18.      The next day, on or about February 17, 2017, however, GEORGE PAPADOPOULOS, the defendant, shut down his Facebook account, which he had maintained since approximately August 2005.  Shortly after he shut down his account, PAPADOPOULOS created a new Facebook account.

19.      The Facebook account that PAPADOPOULOS shut down the day after his interview with the FBI contained information about communications he had with Russian nationals and other foreign contacts during the Campaign, including communications that contradicted his statements to the FBI.  More specifically, the following communications, among others, were contained in that Facebook account, which the FBI obtained through a judicially authorized search warrant:

a.      On or about July 15, 2016, PAPADOPOULOS sent a private Facebook message to a Facebook account identified with Foreign Contact 2, stating: "We can chat on this, this weekend if you can't tonight." Foreign Contact 2 messaged back a Facebook "thumbs up."

b.      On or about July 21, 2016, PAPADOPOULOS sent another private Facebook message to Foreign Contact 2 stating: "How are things [Foreign Contact 2]? Keep an eye on the speech tonight. Should be good."

c.      On or about July 22, 2016, PAPADOPOULOS messaged Foreign Contact 2 on Facebook to ask whether Foreign Contact 2 knew a particular individual with extensive ties to Russian-based businesses and persons. PAPADOPOULOS asked Foreign Contact 2 "[i]f you know any background of him that is noteworthy before I see him, kindly send my way."

d.      On or about October 1, 2016, PAPADOPOULOS sent Foreign Contact 1 a private Facebook message with a link to an article from Interfax.com, a Russian news website. This evidence contradicts PAPADOPOULOS's statement to the Agents when interviewed on or about January 27, 2017, that he had not been "messaging" with Foreign Contact 1 during the campaign while "with Trump."

20.     None of the communications described above was in the new Facebook account created by GEORGE PAPADOPOULOS, the defendant, after he had shut down his existing account upon his February 16, 2017 interview with the FBI.

## Conclusion

21.     Based on the foregoing, I respectfully submit that there is probable cause to believe that GEORGE PAPADOPOULOS, the defendant, violated 18 U.S.C. § 1001 by

11

knowingly and willfully making materially false statements when interviewed on or about

January 27, 2017 by the FBI. I also respectfully submit that there is probable cause to believe

that PAPADOPOULOS violated 18 U.S.C. § 1519 by altering and concealing a record, to wit,

his Facebook account, with intent to obstruct and impede the FBI's ongoing investigation, and in

relation to, or in contemplation of, that investigation.

      22.    As set forth above, the facts described herein are limited to those

necessary to establish probable cause for a criminal complaint. The investigation remains

ongoing.

Respectfully Submitted,

Robert M. Gibbs
Special Agent
Federal Bureau of Investigation

Sworn to before me this $\underline{21}$ day of July, 2017

The Honorable Beryl A. Howell
Chief United States District Judge for the District of Columbia