UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GEORGE PAPADOPOULOS,<br><br>Defendant. | Criminal No.: 17 Cr. 182 (RDM) SEALED<br><br>Violation: 18 U.S.C. § 1001 (False Statements)<br><br>FILED<br>OCT - 5 2017<br>Clerk, U.S. District and<br>Bankruptcy Courts |

## STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America and the defendant, GEORGE PAPADOPOULOS, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty.

*I.    Overview*

1. The defendant, GEORGE PAPADOPOULOS, who served as a foreign policy advisor for the presidential campaign of Donald J. Trump (the "Campaign"), made material false statements and material omissions during an interview with the Federal Bureau of Investigation ("FBI") that took place on January 27, 2017. At the time of the interview, the FBI had an open investigation into the Russian government's efforts to interfere in the 2016 presidential election, including the nature of any links between individuals associated with the Campaign and the Russian government, and whether there was any coordination between the Campaign and Russia's efforts. The FBI opened and coordinated the investigation in Washington, D.C.

2. Defendant PAPADOPOULOS made the following material false statements and material omissions to the FBI:

    a. Defendant PAPADOPOULOS claimed that his interactions with an overseas professor, who defendant PAPADOPOULOS understood to have substantial connections to Russian government officials, occurred before defendant PAPADOPOULOS became a foreign policy adviser to the Campaign. Defendant PAPADOPOULOS acknowledged that the professor had told him about the Russians possessing "dirt" on then-candidate Hillary Clinton in the form of "thousands of emails," but stated multiple times that he learned that information prior to joining the Campaign. In truth and in fact, however, defendant PAPADOPOULOS learned he would be an advisor to the Campaign in early March, and met the professor on or about March 14, 2016; the professor only took interest in defendant PAPADOPOULOS because of his status with the Campaign; and the professor told defendant PAPADOPOULOS about the "thousands of emails" on or about April 26, 2016, when defendant PAPADOPOULOS had been a foreign policy adviser to the Campaign for over a month.

    b. Defendant PAPADOPOULOS further told the investigating agents that the professor was "a nothing" and "just a guy talk[ing] up connections or something." In truth and in fact, however, defendant PAPADOPOULOS understood that the professor had substantial connections to Russian government officials (and had met with some of those officials in Moscow immediately prior to telling defendant PAPADOPOULOS about the "thousands of emails") and, over a period of months, defendant PAPADOPOULOS repeatedly sought to use the professor's Russian connections in an effort to arrange a meeting between the Campaign and Russian government officials.

    c. Defendant PAPADOPOULOS claimed he met a certain female Russian national before he joined the Campaign and that their communications consisted of emails such as, "'Hi, how are you?'" In truth and in fact, however, defendant PAPADOPOULOS met the

2

female Russian national on or about March 24, 2016, after he had become an adviser to the Campaign; he believed that she had connections to Russian government officials; and he sought to use her Russian connections over a period of months in an effort to arrange a meeting between the Campaign and Russian government officials.

3. Through his false statements and omissions, defendant PAPADOPOULOS impeded the FBI's ongoing investigation into the existence of any links or coordination between individuals associated with the Campaign and the Russian government's efforts to interfere with the 2016 presidential election.

## II. Timeline of Selected Events

*PAPADOPOULOS's Role on the Campaign*

4. In early March 2016, defendant PAPADOPOULOS learned he would be a foreign policy advisor for the Campaign. Defendant PAPADOPOULOS was living in London, England, at the time. Based on a conversation that took place on or about March 6, 2016, with a supervisory campaign official (the "Campaign Supervisor"), defendant PAPADOPOULOS understood that a principal foreign policy focus of the Campaign was an improved U.S. relationship with Russia.

*PAPADOPOULOS's Introduction to the Professor and the Female Russian National*

5. On or about March 14, 2016, while traveling in Italy, defendant PAPADOPOULOS met an individual who was a professor based in London (the "Professor"). Initially, the Professor seemed uninterested in defendant PAPADOPOULOS. However, after defendant PAPADOPOULOS informed the Professor about his joining the Campaign, the Professor appeared to take great interest in defendant PAPADOPOULOS. Defendant PAPADOPOULOS was interested in the Professor because, among other reasons, the Professor

claimed to have substantial connections with Russian government officials, which defendant PAPADOPOULOS thought could increase his importance as a policy advisor to the Campaign.

6. On or about March 21, 2016, the Campaign told *The Washington Post* that defendant PAPADOPOULOS was one of five named foreign policy advisors for the Campaign.

7. On or about March 24, 2016, defendant PAPADOPOULOS met with the Professor in London. The Professor brought with him a female Russian national (the "Female Russian National"), introduced to defendant PAPADOPOULOS as a relative of Russian President Vladimir Putin with connections to senior Russian government officials.

*PAPADOPOULOS Pursues His Contacts with the Professor and the Female Russian National*

8. Following his March 24, 2016 meeting with the Professor and the Female Russian National, defendant PAPADOPOULOS emailed the Campaign Supervisor and several members of the Campaign's foreign policy team and stated that he had just met with his "good friend" the Professor, who had introduced him to the Female Russian National (described by defendant PAPADOPOULOS in the email as "Putin's niece") and the Russian Ambassador in London.[1] Defendant PAPADOPOULOS stated that the topic of their discussion was "to arrange a meeting between us and the Russian leadership to discuss U.S.-Russia ties under President Trump." The Campaign Supervisor responded that he would "work it through the campaign," but that no commitments should be made at that point. The Campaign Supervisor added: "Great work."

9. On or about March 31, 2016, defendant PAPADOPOULOS attended a "national security meeting" in Washington, D.C., with then-candidate Trump and other foreign policy

---

[1] Defendant PAPADOPOULOS later learned that the Female Russian National was not in fact a relative of President Putin. In addition, while defendant PAPADOPOULOS expected that the Professor and the Female Russian National would introduce him to the Russian Ambassador in London, they never did.

4

advisors for the Campaign. When defendant PAPADOPOULOS introduced himself to the group, he stated, in sum and substance, that he had connections that could help arrange a meeting between then-candidate Trump and President Putin.

10. After his trip to Washington, D.C., defendant PAPADOPOULOS worked with the Professor and the Female Russian National to arrange a meeting between the Campaign and the Russian government, and took steps to advise the Campaign of his progress.

    a. In early April 2016, defendant PAPADOPOULOS sent multiple emails to other members of the Campaign's foreign policy team regarding his contacts with "the Russians" and his "outreach to Russia."

    b. On or about April 10, 2016, defendant PAPADOPOULOS emailed the Female Russian National, who responded the next day, on or about April 11, 2016, that she "would be very pleased to support your initiatives between our two countries." Defendant PAPADOPOULOS then asked the Female Russian National, in an email cc'ing the Professor, about setting up "a potential foreign policy trip to Russia."

    c. The Professor responded to defendant PAPADOPOULOS's email later that day, on or about April 11, 2016: "This is already been agreed. I am flying to Moscow on the 18th for a Valdai meeting, plus other meetings at the Duma." The Duma is a Russian government legislative assembly.

    d. The Female Russian National responded: "I have already alerted my personal links to our conversation and your request. . . . As mentioned we are all very excited by the possibility of a good relationship with Mr. Trump. The Russian Federation would love to welcome him once his candidature would be officially announced."

---

*The Professor Introduces PAPADOPOULOS to a Russian National Connected to the Russian Ministry of Foreign Affairs*

11. On or about April 18, 2016, the Professor introduced defendant PAPADOPOULOS over email to an individual in Moscow (the "Russian MFA Connection") who told defendant PAPADOPOULOS he had connections to the Russian Ministry of Foreign Affairs ("MFA"). The MFA is the executive entity in Russia responsible for Russian foreign relations. Over the next several weeks, defendant PAPADOPOULOS and the Russian MFA Connection had multiple conversations over Skype and email about setting "the groundwork" for a "potential" meeting between the Campaign and Russian government officials.

12. On or about April 22, 2016, the Russian MFA Connection sent defendant PAPADOPOULOS an email thanking him "for an extensive talk" and proposing "to meet in London or in Moscow." Defendant PAPADOPOULOS replied by suggesting that "we set one up here in London with the Ambassador as well to discuss a process moving forward."

13. On or about April 25, 2016, defendant PAPADOPOULOS emailed a senior policy advisor for the Campaign (the "Senior Policy Advisor"): "The Russian government has an open invitation by Putin for Mr. Trump to meet him when he is ready []. The advantage of being in London is that these governments tend to speak a bit more openly in 'neutral' cities."

*PAPADOPOULOS Learns that the Russians Have "Dirt" on Clinton*

14. On or about April 26, 2016, defendant PAPADOPOULOS met the Professor for breakfast at a London hotel. During this meeting, the Professor told defendant PAPADOPOULOS that he had just returned from a trip to Moscow where he had met with high-level Russian government officials. The Professor told defendant PAPADOPOULOS that on that trip he (the Professor) learned that the Russians had obtained "dirt" on then-candidate Clinton. The Professor told defendant PAPADOPOULOS, as defendant PAPADOPOULOS

later described to the FBI, that "They [the Russians] have dirt on her"; "the Russians had emails of Clinton"; "they have thousands of emails."

15. Following that conversation, defendant PAPADOPOULOS continued to correspond with Campaign officials, and continued to communicate with the Professor and the Russian MFA Connection, in an effort to arrange a meeting between the Campaign and the Russian government.

    a. For example, the day after his meeting at the hotel with the Professor, on or about April 27, 2016, defendant PAPADOPOULOS emailed the Senior Policy Advisor: "Have some interesting messages coming in from Moscow about a trip when the time is right."

    b. Also on or about April 27, 2016, defendant PAPADOPOULOS emailed a high-ranking official of the Campaign (the "High-Ranking Campaign Official") "to discuss Russia's interest in hosting Mr. Trump. Have been receiving a lot of calls over the last month about Putin wanting to host him and the team when the time is right."

    c. On or about April 30, 2016, defendant PAPADOPOULOS thanked the Professor for his "critical help" in arranging a meeting between the Campaign and the Russian government, and remarked: "It's history making if it happens."

*PAPADOPOULOS Shares Information from the Russian MFA Connection*

16. On or about May 4, 2016, the Russian MFA Connection sent an email (the "May 4 MFA Email") to defendant PAPADOPOULOS and the Professor that stated: "I have just talked to my colleagues from the MFA. The[y] are open for cooperation. One of the options is to make a meeting for you at the North America Desk, if you are in Moscow." Defendant PAPADOPOULOS responded that he was "[g]lad the MFA is interested." Defendant PAPADOPOULOS forwarded the May 4 MFA Email to the High-Ranking Campaign Official,

adding: "What do you think? Is this something we want to move forward with?" The next day, on or about May 5, 2016, defendant PAPADOPOULOS had a phone call with the Campaign Supervisor, and then forwarded the May 4 MFA Email to him, adding to the top of the email: "Russia updates."

17. On or about May 13, 2016, the Professor emailed defendant PAPADOPOULOS with "an update" of what they had discussed in their "recent conversations," including: "We will continue to liaise through you with the Russian counterparts in terms of what is needed for a high level meeting of Mr. Trump with the Russian Federation."

18. The next day, on or about May 14, 2016, defendant PAPADOPOULOS emailed the High-Ranking Campaign Official and stated that the "Russian government[] ha[s] also relayed to me that they are interested in hosting Mr. Trump."

19. On or about May 21, 2016, defendant PAPADOPOULOS emailed another high-ranking Campaign official, with the subject line "Request from Russia to meet Mr. Trump." The email included the May 4 MFA Email and added: "Russia has been eager to meet Mr. Trump for quite sometime and have been reaching out to me to discuss."[2]

20. On or about June 1, 2016, defendant PAPADOPOULOS emailed the High-Ranking Campaign Official and asked about Russia. The High-Ranking Campaign Official referred him to the Campaign Supervisor because "[h]e is running point." Defendant PAPADOPOULOS then emailed the Campaign Supervisor, with the subject line "Re: Messages from Russia": "I have the Russian MFA asking me if Mr. Trump is interested in visiting Russia

---

[2] The government notes that the official forwarded defendant PAPADOPOULOS's email to another Campaign official (without including defendant PAPADOPOULOS) and stated: "Let[']s discuss. We need someone to communicate that DT is not doing these trips. It should be someone low level in the campaign so as not to send any signal."

at some point. Wanted to pass this info along to you for you to decide what's best to do with it and what message I should send (or to ignore)."

21. From mid-June through mid-August 2016, PAPADOPOULOS pursued an "off the record" meeting between one or more Campaign representatives and "members of president putin's office and the mfa."

    a. For example, on or about June 19, 2016, after several email and Skype exchanges with the Russian MFA Connection, defendant PAPADOPOULOS emailed the High-Ranking Campaign Official, with the subject line "New message from Russia": "The Russian ministry of foreign affairs messaged and said that if Mr. Trump is unable to make it to Russia, if a campaign rep (me or someone else) can make it for meetings? I am willing to make the trip off the record if it's in the interest of Mr. Trump and the campaign to meet specific people."

    b. After several weeks of further communications regarding a potential "off the record" meeting with Russian officials, on or about August 15, 2016, the Campaign Supervisor told defendant PAPADOPOULOS that "I would encourage you" and another foreign policy advisor to the Campaign to "make the trip[], if it is feasible."

    c. The trip proposed by defendant PAPADOPOULOS did not take place.

### III. *The Defendant's False Statements to the FBI*

22. On or about January 27, 2017, defendant PAPADOPOULOS agreed to be interviewed by agents from the FBI.

23. The agents informed defendant PAPADOPOULOS that the FBI was investigating interference by the Russian government in the 2016 presidential election and whether any individuals related to the Campaign were involved. The agents further informed defendant PAPADOPOULOS that he needed to be truthful and warned that he could get "in trouble" if he

lied. The agents also advised him that lying to them "is a federal offense." They confirmed that the interview was "completely voluntary."

24. During the course of the interview, defendant PAPADOPOULOS made numerous false statements and omitted material facts regarding the conduct and communications described above, and, in particular, lied about the extent, timing, and nature of his communications with the Professor, the Female Russian National, and the Russian MFA Connection.

*False Statement: PAPADOPOULOS Met the Professor and Learned About Russian "Dirt" Before He Joined the Campaign*

25. During his interview with the FBI, defendant PAPADOPOULOS acknowledged that he met the Professor and that the Professor told him the Russians had "dirt" on then-candidate Clinton in the form of "thousands of emails," but defendant PAPADOPOULOS stated multiple times that those communications occurred prior to when he joined the Campaign. Defendant PAPADOPOULOS told the FBI: "This isn't like he [the Professor]'s messaging me while I'm in April with Trump"; "I wasn't even on the Trump team, that wasn't even on the radar"; "I wasn't even on Trump's orbit[] at this time"; and "This was a year ago, this was before I even got with Trump." He also said it was a "very strange coincidence" to be told of the "dirt" before he started working for the Campaign.

26. In truth and in fact, however, and as set forth above, defendant PAPADOPOULOS met the Professor for the first time on or about March 14, 2016, after defendant PAPADOPOULOS had already learned he would be a foreign policy advisor for the Campaign; the Professor showed interest in defendant PAPADOPOULOS only after learning of his role on the Campaign; and the Professor told defendant PAPADOPOULOS about the Russians possessing "dirt" on then-candidate Clinton in late April 2016, more than a month after defendant PAPADOPOULOS had joined the Campaign.

*False Statement: PAPADOPOULOS's Contacts with the Professor Were Inconsequential*

27. During his interview with the FBI, defendant PAPADOPOULOS also made false statements in an effort to minimize the extent and importance of his communications with the Professor. For example, defendant PAPADOPOULOS stated that "[the Professor]'s a nothing," that he thought the Professor was "just a guy talk[ing] up connections or something," and that he believed the Professor was "BS'ing to be completely honest with you."

28. In truth and in fact, however, defendant PAPADOPOULOS understood the Professor to have substantial connections to high-level Russian government officials and that the Professor spoke with some of those officials in Moscow before telling defendant PAPADOPOULOS about the "dirt." Defendant PAPADOPOULOS also engaged in extensive communications over a period of months with the Professor regarding foreign policy issues for the Campaign, including efforts to arrange a "history making" meeting between the Campaign and Russian government officials.

29. In addition, defendant PAPADOPOULOS failed to inform investigators that the Professor had introduced him to the Russian MFA Connection, despite being asked if he had met with Russian nationals or "[a]nyone with a Russian accent" during the Campaign. Indeed, while defendant PAPADOPOULOS told the FBI that he was involved in meetings and did "shuttle diplomacy" with officials from several other countries during the Campaign, he omitted the entire course of conduct with the Professor and the Russian MFA Connection regarding his efforts to establish meetings between the Campaign and Russian government officials.

*False Statement: PAPADOPOULOS Met the Female Russian National Before He Joined the Campaign, and His Contacts with Her Were Inconsequential*

30. During his interview with the FBI, defendant PAPADOPOULOS also falsely claimed that he met the Female Russian National before he joined the Campaign, and falsely told the FBI that he had "no" relationship at all with the Female Russian National. He stated that the extent of their communications was her sending emails – "Just, 'Hi, how are you?'" "That's it."

31. In truth and in fact, however, defendant PAPADOPOULOS met the Female Russian National on or about March 24, 2016, after he had joined the Campaign; he believed that the Female Russian National had connections to high-level Russian government officials and could help him arrange a potential foreign policy trip to Russia; and during the Campaign he emailed and spoke over Skype on numerous occasions with the Female Russian National about the potential foreign policy trip to Russia.

### IV. Events Following PAPADOPOULOS's January 27, 2017 Interview with the FBI

32. The FBI interviewed defendant PAPADOPOULOS again on February 16, 2017. His counsel was present for the interview. During the interview, defendant PAPADOPOULOS reiterated his purported willingness to cooperate with the FBI's investigation.

33. The next day, on or about February 17, 2017, defendant PAPADOPOULOS deactivated his Facebook account, which he had maintained since approximately August 2005 and which contained information about communications he had with the Professor and the Russian MFA Connection. Shortly after he deactivated his account, PAPADOPOULOS created a new Facebook account that did not contain the communications with the Professor and the Russian MFA Connection.

34. On or about February 23, 2017, defendant PAPADOPOULOS ceased using his cell phone number and began using a new number.

35. On July 27, 2017, defendant PAPADOPOULOS was arrested upon his arrival at Dulles International Airport. Following his arrest, defendant PAPADOPOULOS met with the Government on numerous occasions to provide information and answer questions.

ROBERT S. MUELLER, III
Special Counsel

By: _____
Jeannie S. Rhee
Andrew D. Goldstein
Aaron S.J. Zelinsky
The Special Counsel's Office

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

I have read every word of this Statement of the Offense, or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: 10/5/17

George Papadopoulos
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: 10/5/17

Thomas M. Breen
Robert W. Stanley
Attorneys for Defendant