**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **GEORGE PAPADOPOULOS,** | **Crim. No. 17-182 (RDM)** |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this memorandum in connection with the sentencing of George Papadopoulos scheduled for September 7, 2018.  On October 5, 2017, Papadopoulos pleaded guilty to one count of making false statements in violation of 18 U.S.C. § 1001(a).  The government does not take a position with respect to a particular sentence to be imposed, but respectfully submits that a sentence of incarceration, within the applicable Guidelines range of 0 to 6 months' imprisonment, is appropriate and warranted.

The defendant's crime was serious and caused damage to the government's investigation into Russian interference in the 2016 presidential election.  The defendant lied in order to conceal his contacts with Russians and Russian intermediaries during the campaign and made his false statements to investigators on January 27, 2017, early in the investigation, when key investigative decisions, including who to interview and when, were being made.  The defendant was explicitly notified of the seriousness of the ongoing investigation, and was told that he may have important information to provide.  He was warned that lying to investigators was a "federal offense" that could get him "in trouble."  Instead of telling the truth, however, the defendant repeatedly lied throughout the interview in order to conceal the timing and significance of information the

defendant had received regarding the Russians possessing "dirt" on Hillary Clinton, as well as his own outreach to Russia on behalf of the campaign. The defendant's false statements were intended to harm the investigation, and did so.

In light of the defendant's conduct and the lack of mitigating circumstances, the principles of sentencing set forth in 18 U.S.C. § 3553(a) call for a period of incarceration.

**Offense Conduct**

Although the defendant's principal offense conduct is set forth in the Statement of Offense and the Presentence Investigation Report (PSR), the government notes there are particular facts to underscore for purposes of sentencing.

First, the defendant chose to meet with investigators and lie to them. The interview on January 27, 2017 was not a hurried or forced encounter: the agents met the defendant where he was living at the time, they told him they wanted his help with a sensitive national security investigation, and they made it clear the interview would be "completely voluntary." (PSR ¶ 51).[1] The defendant said he wanted to help the agents with their investigation, and he chose to travel with the agents to the FBI office in Chicago, Illinois, where he proceeded to answer questions, and to lie, for more than two hours.

Second, before answering questions, the defendant was expressly warned that it is a crime to lie to federal investigators. The agents told the defendant "the only thing we ask from you is that you're truthful with us . . . and the only way you're getting in trouble today is if you do lie to us." The agents told the defendant that they were both FBI agents "and that means lying to us is [] a federal offense." Before proceeding with substantive questions, the agents stressed again that the interview was "completely voluntary," told the defendant that if he ever became uncomfortable

---

[1] The government provided to the defendant copies of the video and audio recordings of the FBI's January 27, 2017 interview, along with a prepared transcript.

they would take a break, and re-emphasized that "the only thing, we don't want dis-information" because that would "make[] our job a lot harder."  The defendant acknowledged the agents' admonitions.  He thereafter deliberately and repeatedly lied.

Third, the defendant was expressly informed about the nature and importance of the investigation.  The agents told him the FBI was investigating interference by the Russian government in the 2016 presidential election and any connections between the Russian government and the campaign.  The agents told the defendant that he was in a position to provide useful information because he had firsthand knowledge of the Trump campaign and "who, if anybody, has [a] connection with Russia and what [] sort of connections there were."  The agents emphasized that they "really want to nail down this Russian involvement in the election," and stressed that "this is an important issue for the government to figure out right now."  Thus, the defendant knew that any lies he told had the potential to impede the FBI's Russia investigation.

Fourth, the defendant lied about his contacts with Russians and Russian intermediaries during the course of the campaign to minimize both his own role as a witness and the extent of the campaign's knowledge of his contacts.  As described in detail in the Statement of Offense and the PSR, while serving as a policy advisor to the Trump campaign, the defendant met a professor of diplomacy in London (the "Professor") who introduced the defendant to a Russian woman (the "Female Russian National") and to a Russian national connected to the Russian Ministry of Foreign Affairs (the "Russia MFA Connection").  (PSR ¶¶ 22-49).  The Professor told the defendant that the Russians had "dirt" on Hillary Clinton in the form of "thousands of emails," and the defendant had a series of communications over a period of months with the Professor, the Female Russian National, and the Russia MFA Connection in which they discussed arranging a meeting between Russian officials and the Trump campaign.  (PSR ¶¶ 22-49).

Rather than acknowledging these contacts and communications, the defendant concealed them from the FBI. He lied about their timing, extent, and nature. With respect to timing, the defendant acknowledged that the Professor had told him about the Russians possessing "dirt" on Clinton, but he stated multiple times that this occurred before he joined the Trump campaign and that it was a "very strange coincidence" to be told of the "dirt" before he started working for the campaign.[2] As the defendant well knew, this account was false: the defendant met the Professor for the first time on or about March 14, 2016, after the defendant had already learned he would be a foreign policy advisor for the Trump campaign; the Professor showed interest in the defendant only after learning of his role on the campaign; and the Professor told the defendant about the Russians possessing "dirt" on Clinton in late April 2016, more than a month after the defendant had joined the campaign. The timing of the defendant's receipt of this information was critical: by falsely claiming that it occurred in February, before the defendant joined the Trump campaign,

---

[2] In several recent media appearances, the defendant's spouse has claimed that the defendant "voluntarily reported" to the FBI the Professor's conversation with him about the "dirt" on Clinton. *See* CNN, Papadopoulos' Wife Asks Trump to Pardon Him, Says He's 'Loyal to the Truth,' June 6, 2018 (claiming at approximately 4:08 that the defendant "actually volunteered – he reported to the FBI about this meeting"); Fox News, Rethinking 'Collusion' and the George Papadopoulos Case, June 4, 2018, (claiming at approximately 2:11 that the defendant "voluntarily reported to the FBI at the time of their interview"); Chuck Ross, Papadopoulos' Wife: Trump Aide Was 'Absolutely Not' Involved in Russian Collusion, June 4, 2018, available at http://dailycaller.com/2018/06/04/mangiante-papadopoulos-collusion/ (stating that it was the "defendant who brought up" the matter).

To the contrary, the defendant identified the Professor only after being prompted by a series of specific questions about when the defendant first learned about Russia's disclosure of information related to the campaign and whether the defendant had ever "received any information or anything like that from a [] Russian government official." In response, while denying he received any information from a Russian government official, the defendant identified the Professor by name – while also falsely claiming he interacted with the Professor "before I was with Trump though." Over the next several minutes in the interview, the defendant repeatedly and falsely claimed that his interactions with the Professor occurred before he was working for the Trump campaign, and he did not mention his discussion with the Professor about the Russians possessing "dirt" on Clinton. That fact only came up after additional specific questioning from the agents. The agents asked the defendant: "going back to the WikiLeaks and maybe the Russian hacking and all that, were you ever made aware that the Russians had intent to disclose information [] ahead of time? So before it became public? Did anyone ever tell you that the Russian government plans to release some information[,] like tell the Trump team ahead of time[,] that that was going to happen?" The defendant responded, "No." The agents then skeptically asked, "No?" The defendant responded: "No, not on, no not the Trump [campaign], but I will tell you something and – and this is . . . actually very good that we're, that you just brought this up because I wasn't working with Trump at the time[.] I was working in London . . . with that guy [the Professor]." Only then, after acknowledging that the agents had "brought this up" and lying about when he received the information, did the defendant admit that the Professor had told him "the Russians had emails of Clinton."

the defendant hoped to convince the agents that his conversation with the Professor was simply a "strange coincidence" and had nothing to do with his position in that campaign.

The defendant also made false statements in an effort to minimize the extent and importance of his communications with the Professor, including by referring to the Professor as "a nothing" who was "just a guy . . . talk[ing] up connections or something," even though the defendant understood the Professor to have substantial connections to high-level Russian government officials and that the Professor spoke with some of those officials in Moscow before telling the defendant about the "dirt." The defendant also falsely told the FBI that he met the Female Russian National before he joined the campaign, that he had "no" relationship at all with her, and that the extent of their communications was her sending emails—"Just, 'Hi, how are you?' . . . That's it." In truth, however, the defendant first met the Female Russian National on or about March 24, 2016, after he had joined the campaign; he believed that she had connections to high-level Russian government officials and could help him arrange a potential foreign policy trip to Russia; he informed the campaign of his beliefs regarding her connections; and during the campaign he emailed and spoke over Skype on numerous occasions with her about the potential trip to Russia. The defendant also did not reveal his extensive interactions with the Russia MFA Connection, including over Skype, even though he was asked if he had met during the campaign with any Russian nationals or "[a]nyone with a Russian accent."

Fifth, the defendant's lies were not only deliberate, but repeated. On at least a dozen occasions during the interview, the defendant falsely insisted that his interactions with the Professor took place before the defendant joined the Trump campaign. At various points during the interview, the defendant said the interactions took place "prior to even talking to anybody on Trump"; they had "nothing to do with Trump"; "this was before I even got with-with Trump"; "I

wasn't even on the Trump [] team"; "that wasn't even on the radar"; "I wasn't even on the orbit of Trump at the time"; and "This isn't like [the Professor's] messaging me while I'm in April with Trump or something." The defendant also claimed over and over again that his interactions with the Professor were a "very strange coincidence" – "what I'm telling you, it was very strange that that even happened." And to further conceal his communications with the Professor, the defendant told yet another lie: as the agents asked the defendant additional questions about his communications with the Professor, the defendant assured them he was being truthful and transparent: "I'm just trying to, I'm giving you even the most minute transparent details"; "I've been open, truthful about who I know, what I know"; "like I said, [] I want to help [], that's all the information that I have."

Sixth, the defendant had a chance to correct his false statements – he retained counsel, and spoke with the FBI again in February 2017, but did not correct the record. Instead, as set forth in the PSR, in an effort to put the investigation behind him, the defendant deactivated his Facebook account that contained communications with the Professor and the Russian MFA Connection and obtained a new phone.

Seventh, the lies were material to the investigation. The defendant's lies to the FBI in January 2017 impeded the FBI's investigation into Russian interference in the 2016 presidential election. Most immediately, those statements substantially hindered investigators' ability to effectively question the Professor when the FBI located him in Washington, D.C. approximately two weeks after the defendant's January 27, 2017 interview. The defendant's lies undermined investigators' ability to challenge the Professor or potentially detain or arrest him while he was still in the United States. The government understands that the Professor left the United States on February 11, 2017 and he has not returned to the United States since then.

The defendant's lies also hindered the government's ability to discover who else may have known or been told about the Russians possessing "dirt" on Clinton.  Had the defendant told the FBI the truth when he was interviewed in January 2017, the FBI could have quickly taken numerous investigative steps to help determine, for example, how and where the Professor obtained the information, why the Professor provided the information to the defendant, and what the defendant did with the information after receiving it.

The government cannot definitively know what motivated the defendant to lie to the agents on January 27, 2017.  But the record shows that at the time of the interview, the defendant was attempting to secure a job with the Trump Administration and had an incentive to protect the Administration and minimize his own role as a witness.  (PSR ¶ 50).  In January 2017, the defendant had several communications with officials of the incoming Administration in an effort to obtain a high-level position with the National Security Council, the State Department, or the Energy Department.  On January 27, 2017, in the hours after being interviewed by the FBI, the defendant submitted his biography and a description of work he did on the campaign in an effort to obtain a position as a Deputy Assistant Secretary in the Energy Department.  (PSR ¶ 50).

### Efforts to Cooperate

The plea agreement entered into by the government and the defendant was not a standard cooperation agreement, and the government did not agree to make a motion under U.S.S.G. § 5K1.1 based on cooperation by the defendant.  Nevertheless, the government agreed to "bring to the Court's attention at sentencing the defendant's efforts to cooperate with the Government, on the condition that [the defendant] continues to respond and provide information regarding any and all matters as to which the Government deems relevant." (Plea Agreement p. 4).  Pursuant to this agreement, the Government provides the Court with the following information.

After the defendant was arrested at Dulles International Airport on July 27, 2017, he agreed to meet with the government and answer questions. Over four days in August and September 2017, the defendant sat for interviews with the government, pursuant to a proffer agreement, and provided information about a range of topics.

The defendant did not provide "substantial assistance," and much of the information provided by the defendant came only after the government confronted him with his own emails, text messages, internet search history, and other information it had obtained via search warrants and subpoenas well after the defendant's FBI interview as the government continued its investigation.  The defendant also did not notify the government about a cellular phone he used in London during the course of the campaign – that had on it substantial communications between the defendant and the Professor – until his fourth and final proffer session.  This cell phone was not among the devices seized at the airport because it was already in the defendant's family home in Chicago.  Upon request, the defendant provided that phone to the government and consented to the search of that device.

Following the proffer sessions in August and September 2017, the government arranged to meet again with the defendant to ask further questions in late December 2017.  However, upon learning that the defendant had participated in a media interview with a national publication concerning his case, the government canceled that meeting.  (PSR ¶ 50).  The government is aware that the defendant and his spouse have participated in several additional media interviews concerning his case.

### The Principles of Sentencing Call for a Sentence of Incarceration

The government respectfully submits that in light of the defendant's conduct, the principles of sentencing set forth in 18 U.S.C. § 3553(a) call for a sentence of incarceration.  The defendant's

crime was serious, both in terms of the underlying conduct and its effect on the investigation. The defendant knew the questions he was asked by the FBI were important, and he knew his answers were false at the time he gave them. His lies negatively affected the FBI's Russia investigation, and prevented the FBI from effectively identifying and confronting witnesses in a timely fashion. His lies were not momentary lapses. He lied repeatedly over the course of more than two hours, and his lies were designed to conceal facts he knew were critical: the importance of the information he received from the Professor, and his own communications and contacts with Russians and Russian intermediaries during the Trump campaign. The sentence imposed here should reflect the fact that lying to federal investigators has real consequences, especially where the defendant lied to investigators about critical facts, in an investigation of national importance, after having been explicitly warned that lying to the FBI was a federal offense. The nature and circumstances of the offense warrant a sentence of incarceration.

In order to avoid unwarranted sentencing disparities in similar cases, the government notes that a previous defendant charged by the Special Counsel's Office who pleaded guilty to violating 18 U.S.C. § 1001(a), Alex van der Zwaan, was sentenced to a term of imprisonment of 30 days. *See United States* v. *van der Zwaan*, 18 Cr. 31 (ABJ) (April 5, 2018). In imposing the sentence in that case, Judge Jackson explained that "[l]ying would be wrong in any criminal investigation, and this investigation also involves important questions of great national and international interest; it involves our country's and probably other countries' national security, and the prospect of potential foreign interference in the democratic processes that are fundamental to our freedom." (*Id.*, Tr. at 31).

**Monetary Penalties**

Based on the defendant's offense level under the Guidelines, the applicable range for a fine

is $500 to $9,500.  The defendant provided information about $10,000 in cash he received from a

foreign national whom he believed was likely an intelligence officer of a foreign country (other

than Russia).  The defendant has stated that he kept that money in a safe pending his sentencing in

this case and Counsel for the defendant has consented to the imposition of this fine amount.

Forfeiture is not applicable in this case.

**Conclusion**

For the reasons set forth above, the government respectfully submits that a sentence of

incarceration, within the applicable Guidelines range of 0 to 6 months' imprisonment, and a $9,500

fine are warranted and appropriate.

Respectfully submitted,

ROBERT S. MUELLER III
Special Counsel

Dated: August 17, 2018          By:     \_\_/s/_____
                                        Jeannie S. Rhee
                                        Andrew D. Goldstein
                                        Aaron S.J. Zelinsky
                                        U.S. Department of Justice
                                        Special Counsel's Office
                                        950 Pennsylvania Avenue NW
                                        Washington, D.C. 20530
                                        Telephone: (202) 616-0800

                                        *Attorneys for the United States of America*