# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff | No. 17 CR 182 |
| v. | Hon. Randolph D. Moss |
| | *Judge Presiding* |
| GEORGE PAPADOPOULOS | |
| Defendant | |

## **DEFENDANT'S SENTENCING MEMORANDUM**

Defendant George Papadopoulos, by his attorneys, Breen & Pugh, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3553(a), as well as the Sixth Amendment to the Constitution of the United States, respectfully submits this sentencing memorandum and requests this Honorable Court sentence him to a period of probation terminated *instanter*. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

### INTRODUCTION

Mr. Papadopoulos's offense was unquestionably serious as he made materially false statements to FBI agents investigating the Russian government's efforts to interfere in the 2016 presidential election. He lied during the course of an investigation that raised serious national security concerns. For that, Mr. Papadopoulos is ashamed and remorseful.

The Government's claim, however, that Mr. Papadopoulos intended that his false statements harm the investigation is speculative and contrary to the evidence. His motives for lying to the FBI were wrongheaded indeed but far from the sinister

spin the Government suggests. Caught off-guard by an impromptu interrogation, Mr. Papadopoulos misled investigators to save his professional aspirations and preserve a perhaps misguided loyalty to his master.

## LEGAL PRINCIPLES

Sentencing a criminal defendant is one of the trial court's most important yet difficult tasks. Determining the appropriate sentence "requires a court to consider with great care and sensitivity, a large complex of facts, and factors." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). The Supreme Court has stated that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States,* 131 S.Ct. 1229, 1239-40 (2011) (quoting *Koon v. United States,* 518 U.S. 81, 113 (996)).

It is essential that a court's sentencing decision be informed and guided by the fundamental doctrines of mercy and compassion. *See United States v. Blarek,* 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998). While these principles are not specifically delineated as rationales for sentencing, they are evidenced by the federal sentencing statute's mandate that the court impose the lowest possible punishment to accomplish the goals of sentencing. *Id;* 18 U.S.C. § 3553(a) (the court shall impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing). As the Second Circuit recently explained:

> Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge." Jack B. Weinstein, *Does Religion Have a Role in*

*Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007). While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of "the diverse frailties of humankind." *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513 (1993); *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979), reprinted in 82 F.R.D. 209, 209 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases.").

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

ARGUMENT

Sentencing is governed by 18 U.S.C. § 3553(a), which provides that the sentence imposed must be "sufficient, but not greater than necessary" to satisfy the purposes of sentencing. *Id.* The Supreme Court has recognized that this "parsimony provision" is the "overarching instruction" of the sentencing statute. *Kimbrough v. United States*, 552 U.S. 85, 101, 128 S.Ct. 558, 570, 575, 169 L.Ed.2d 481 (2007).

In this case, a sentence of probation, terminated *instanter*, is sufficient, but not greater than necessary to adequately accomplish the goals of sentencing. While his offense was grave, Mr. Papadopoulos did not intend to derail the federal investigation.

3

I.      **George Papadopoulos's Personal History and Characteristics and the Events Preceding the Offense**

As a young man, George demonstrated a keen interest in politics, international relations, and diplomacy. He attended DePaul University, where he studied government and national security. After earning his bachelor's degree in political science, he enrolled at Kings College in London, England, where he studied public policy, international law, and national security. In 2010, George received a Master of Science in Security Studies.

The following year, George interned at the Hudson Institute, a conservative think tank in Washington, D.C., where he researched nuclear non-proliferation, national defense, and U.S. relations with Azerbaijan and Kazakhstan. The Hudson Institute later hired George to work on two energy security projects. George devoted his early career to energy policies particular to Cyprus, Israel, Egypt, and Greece. He became somewhat of an aficionado in this field, authoring papers and lecturing on the topic.

In the summer of 2015, George attempted to step into United States presidential politics when he applied to work for Donald Trump's campaign. George supported candidate Trump's policy positions and believed that Mr. Trump was the only Republican candidate that had a chance of beating likely Democratic challenger Hillary Clinton. When George failed to secure a position with the Trump campaign, he took up with candidate Dr. Ben Carson as a foreign policy advisor. George continued in this position until January 2016 when Dr. Carson began winding down his campaign.

Still a stalwart supporter of Trump's bid for the presidency, George doubled down on his efforts to join that campaign and, in early March 2016, he received an interview for the position of foreign policy advisor. During his meeting with a senior Trump campaign official, George learned that the campaign's foreign policy focus would be improving relations with Russia. George landed the job despite having no experience with U.S. and Russian diplomacy.

On March 14, 2016, George met London-based college Professor Joseph Mifsud while traveling in Italy. When Mifsud, then director of the London Academy of Diplomacy, claimed connections to the Russian Government, George thought he could utilize him and his connections to help the Trump campaign promote its policy objectives. Professor Mifsud paid young George little attention until learning of his position as one of Trump's foreign policy advisors.

Donald Trump publicly named George as one of his campaign's foreign policy advisors on March 21, 2016, boasting to reporters: "He's an energy and oil consultant, excellent guy." Three days later, on March 24, 2016, George met again with Professor Mifsud in London where he introduced George to a young woman named Olga, who Professor Mifsud claimed was a relative of Russian President Vladimir Putin. Professor Mifsud and Olga led George to believe that they had the wherewithal to set up a meeting between the Trump campaign and Russian government officials.

Returning to Washington D.C., twenty-eight-year-old George witnessed his career skyrocketing to unimaginable heights. On March 31, 2016, he joined Mr. Trump, Senator Jeff Sessions, and other campaign officials for a "National Security

Meeting" at the Trump Hotel. George's photograph at this meeting flashed around the world via Twitter. Eager to show his value to the campaign, George announced at the meeting that he had connections that could facilitate a foreign policy meeting between Mr. Trump and Russian President Vladimir Putin. While some in the room rebuffed George's offer, Mr. Trump nodded with approval and deferred to Mr. Sessions who appeared to like the idea and stated that the campaign should look into it.

George's giddiness over Mr. Trump's recognition was prominent during the days that followed the March 31, 2016 meeting. He had a sense of unbridled loyalty to the candidate and his campaign and set about trying to organize the meeting with President Putin. George continued his discussions with Professor Mifsud and Olga – who he believed to be President Putin's niece – about arranging a meeting between the Trump campaign and the Russian government. George kept the campaign in the loop and, in mid-April 2016, Professor Mifsud introduced George to Ivan Timofeev who claimed to have connections to the Russian Ministry of Foreign Affairs. Seemingly on a roll, George again seized this opportunity to try and organize a meeting between the campaign and Russian officials. Mr. Timofeev claimed to be in Moscow and for several weeks, George pressed him through emails and Skype calls about setting up a potential meeting.

To say George was out of his depth would be a gross understatement. Despite being a young energy policy guru, he had no experience in dealing with Russian policy or its officials. Nonetheless, George strived to organize a meeting with the Russian

government and help the Trump campaign promote its foreign policy objective: improve U.S. and Russian relations. He believed that such a meeting would be a boon for the campaign as Mr. Trump had not yet hosted any major foreign policy events with officials from other countries.

George joined Professor Mifsud for breakfast in London on April 26, 2016, with the intention of finalizing plans for the foreign policy meeting. It was during this breakfast meeting, however, that Professor Mifsud told George that individuals in Moscow possessed "dirt" on candidate Hillary Clinton in the form of "thousands of emails." Not knowing what to make of this comment, George continued his efforts to make the Trump – Russia meeting a reality. As he expressed in an email to Professor Mifsud, George believed that the meeting would be "history making." While the meeting never occurred, George sincerely thought that he could be at the center of a globally significant event.

## II.     Nature and Circumstances of the Offense

On the morning of January 27, 2017, as George stepped out of the shower at his mother's home in Chicago, two FBI agents knocked on the door seeking to interview him. The agents asked George to accompany them to their office to answer a "couple questions" regarding "a guy in New York that you might know[,] [t]hat has recently been in the news." George thought the agents wanted to ask him about Russian businessman Sergei Millian. Wanting clarification, he asked the agents, "…just so I understand, I'm going there to answer questions about this person who I

think you're talking about." The agents assured George that the topic of discussion was Mr. Millian who had been trending in the national media.

En route to the FBI office, George voiced concern about the repercussions of his cooperation ever becoming public because the Wall Street Journal had just reported that Sergei Millian was a key source in the "Trump Dossier" controversy. George explained that he was in discussions with senior Trump administration officials about a position and the last thing he wanted was "something like this" casting the administration in a bad light. The agents assured him that his cooperation would remain confidential.  George let the agents know that he wanted to help so that he could move on and serve his country.

Seemingly as promised, the agents began their questioning about George's relationship with Sergei Millian. George knew Mr. Millian only as a businessman pitching an opportunity to George in his personal capacity. The agents asked how they first met, what they discussed, how often they talked or met in person, if George knew whether Mr. Millian was connected to Russia or a foreign intelligence service, and who else on Mr. Trump's campaign may have been in contact with Mr. Millian. George answered their questions honestly.

### A.     George Papadopoulos Lied to the FBI for Personal Reasons; Not to Impede the Investigation

Less than twenty minutes into the interview, the agents dropped the Millian inquiry and turned to recent news about Russian influence in the presidential election. George told the agents he had no knowledge of anyone on the campaign colluding with the Russians and it would not have been in anyone's interest to

undermine the democratic process. George was surprised to be answering questions about Russian interference in the election and told the agents the topic caught him off guard.

The FBI agent confirmed that the Sergei Millian inquiry was just a ruse to get him in a room when he told George that:

> … the reason we wanted to pull you in today and have that conversation because we wanted to know to the extent of your knowledge being an insider inside that small group of people that were policy advisors who, if anybody, has that connection with Russia and what, what sort of connections there were.

For the next two hours, George answered questions about Professor Mifsud, Olga, Carter Page, Sergei Millian and the "Trump Dossier," and George's interactions with other people working on the campaign. The agents asked George if he would be willing to actively cooperate and contact various people they had discussed. While George did not think he would be able to get information from those individuals, he stated his willingness to try. He told the agents he was unaware of anyone in the campaign knowing of the stolen Hillary Clinton emails prior to the emails being publicly released. Further, George told the agents he had no knowledge of meetings between Russian government officials and people working on the campaign.

George found himself personally conflicted during the interrogation as he felt obligated to assist the FBI but also wanted to distance himself and his work on the Trump campaign from that investigation. Attempting to reconcile these competing interests, George provided information he thought was important to the investigation while, at the same time, misleading the agents about the timing, nature, and extent

of his contacts with Professor Mifsud, Olga, and Ivan Timofeev. In his answers, George falsely distanced his interactions with these players from his campaign work. At one point, George told the agents that he did not want to "get too in-depth" because he did not know what it would mean for his professional future. He told the agents he was "trying to help the country and you guys, but I don't want to jeopardize my career."

George lied about material facts central to the investigation. To generalize, the FBI was looking into Russian contacts with members of the Trump campaign as part of its larger investigation into Russian interference with the 2016 election. This issue had dominated the news for several months with stories concerning Carter Page and Paul Manafort. The agents placed this issue squarely on the table before George and he balked. In his hesitation, George lied, minimized, and omitted material facts. Out of loyalty to the new president and his desire to be part of the administration, he hoisted himself upon his own petard.

### B.   Mr. Papadapoulos's False Statements Never Actually Hindered the Government's Investigation

In its sentencing memorandum, the Government claims that Mr. Papadopoulos impeded the FBI's investigation because his false statements hindered investigators' ability to effectively question Professor Mifsud or arrest him while he was still in the United States. Additionally, the Government argues that Mr. Papadopoulos's false statements hampered other investigative steps to help determine how Professor Mifsud obtained the information about the Clinton emails,

why he provided the information to George, and what George did with the information after he received it.

The Government's argument is speculative at best as it has not shown counsel nor the Court any evidence tending to show its investigation was actually hindered in the manner described. Mr. Papadopoulos admits that his false statements on January 27, 2017 were material, in that his statements had the *ability* to influence the actions of the agents investigating Russian interference in the 2016 presidential election. He does not, however, believe his false statements actually harmed the investigation as alleged.

Indeed, while George misled investigators regarding *when* Professor Mifsud told him the Russians had "dirt" on Hillary Clinton, it was still apparent, despite George's lie, that Professor Mifsud communicated this information to George *prior* to the stolen emails being made public.

Moreover, at the time investigators interviewed Professor Mifsud they were unaware of George's false statements, and George was still a cooperating source in their investigation. It seems improbable that the investigators would have challenged Professor Mifsud with George's statements for fear of revealing their source. Additionally, if Professor Mifsud denied telling George about the stolen emails, it is unlikely he would have said something different if the agents confronted him with additional information.

If investigators wished to know what George did with the information from Professor Mifsud, they could have asked George during his interview. Indeed, they

did ask if George provided the information to the campaign and George denied ever doing so. In his later proffer sessions, George reiterated that he does not recall ever passing the information along to the campaign.

## III.    The Nature and Extent of Mr. Papadopoulos's Cooperation

After his arrest on July 27, 2017, George cooperated fully with federal investigators. George participated in four proffer sessions and was willing to answer any questions posed. George consented to searches of his electronic devices and allowed investigators to review a journal with notes from when he worked on the Trump campaign. He also identified emails and explained his interactions and communications with Sergei Millian, Professor Mifsud, Olga, Ivan Timofeev, and others.

Additionally, George provided investigators with critical information. George told investigators about his interactions and meetings with other members of the campaign. He detailed a meeting in late May 2016 where he revealed to the Greek Foreign Minister that the Russians had "dirt" on Hillary Clinton. He explained that this meeting took place days before President Vladimir Putin traveled to Greece to meet with Greek officials.

Most significantly, George told investigators about the March 31, 2016 "National Security Meeting" in Washington D.C. where he told Mr. Trump, Mr. Sessions, and everyone else present that he had connections willing to help organize a meeting between Mr. Trump and Russian President Vladimir Putin. George

recounted why he made the statement in a meeting that was little more than a meet-and-greet, and the reactions of the people in the room.

Lastly, even after the Government stopped meeting with George for proffer sessions in December 2017, George agreed to three Government-requested extensions of his eventual sentencing. While this case has weighed heavily on George, he agreed to the extensions as a courtesy to the Government and their investigation.

## IV.    Probation is an Appropriate Sentence

Probation is a serious punishment that carries real consequences. It is by no means a grant of unlimited freedom. A sentence of probation would necessarily involve a series of judicially imposed restrictions on George's freedom, and the requirement that he be closely supervised by the probation office. Moreover, even a sentence of probation will leave George with a federal felony conviction following him for the rest of his life. That conviction, standing alone, is a significant punishment. *See, e.g., United States v. Engler*, 806 F.2d 425, 440 (3d Cir. 1986) ("it has been traditionally recognized that collateral consequences of felony convictions are both inevitable and serious"); *Parker v. Ellis*, 362 U.S. 574, 593-94 (1960) (Warren, C.J., dissenting) ("conviction of a felony imposes a *status* upon a person which … seriously affects his reputation and economic opportunities").

As the Government notes, another defendant charged by the Special Counsel's Office who pleaded guilty to making a materially false statement, in violation of 18 U.S.C. § 1001(a), was sentenced to thirty-days imprisonment. *See* Govt. Memo at 9; *United States v. Van Der Zwaan,* 18 CR 31, Doc. Nos. 1, 27 (D.C. 2018). While Mr.

Van Der Zwaan and George pleaded guilty to the same offense, George's criminal conduct was far less egregious.

First, Mr. Van Der Zwaan was an experienced lawyer, who worked at a major international law firm, and was represented by counsel at the time he lied to federal investigators. Unlike Mr. Van Der Zwaan, George has no legal training and was not represented by counsel during the interrogation on January 27, 2017. It was not until investigators sought to interview George a second time that he consulted with and had counsel present during the interview.

Second, Mr. Van Der Zwaan's lies concerned topics central to the criminal indictments of Paul Manafort and Richard Gates, which had been announced just days before his interview. Not only did Mr. Van Der Zwaan know the specific allegations against Mr. Manafort and Mr. Gates, Mr. Van Der Zwaan had direct involvement in certain aspects of the alleged offenses. At the time of George's interview, the Special Counsel had not yet been appointed and the scope of the investigation was not as clear. George lied to investigators about *when* Professor Mifsud told him about the Russians having "dirt" on Hillary Clinton and believed the most important fact was that Professor Mifsud knew about the stolen emails prior to them becoming public.

Third, when confronted with evidence contradicting his false statements, Mr. Van Der Zwaan continued to lie to investigators. He also withheld and destroyed evidence requested by the Special Counsel's Office. Conversely, George acknowledged his dishonesty when confronted and admitted his false statements and told

investigators the true nature and extent of his contacts with Professor Mifsud and others.

Finally, a comparison of George's and Mr. Van Der Zwaan's pretrial circumstances lends further support to George's request of probation terminated *instanter*. The government allowed Mr. Van Der Zwaan to voluntarily appear in court and be sentenced less than two months later. In comparison, investigators publicly arrested George at Dulles International Airport and detained him overnight for his arraignment the following day. He has remained under the supervision of Pretrial Services for thirteen months at the government's request. Thus, George has already served the equivalent of one year of probation. Sentencing him to any custodial sentence would create an unwarranted sentencing disparity.

## CONCLUSION

George Papadopoulos is now a convicted felon. When it came time to make a good decision he made a bad one. His arrest and prosecution served as notice to all involved that this was a serious investigation. He was the first domino, and many have fallen in behind. Despite the gravity of his offense, it is important to remember what Special Counsel said at George's plea of guilty: he was just a small part of a large-scale investigation.

Respectfully submitted,

BREEN & PUGH
Counsel for George Papadopoulos

Dated: 31 August 2018          By:      /s/ Robert W. Stanley

Thomas M. Breen
Todd S. Pugh
Robert W. Stanley
BREEN & PUGH
53 West Jackson Boulevard
Suite 1215
Chicago, Illinois 60604
(312) 360-1001

16